IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHRISTOPHER ORJI | : | CIVIL ACTION |
| Plaintiff | : | |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA | : | NO. 12-CV-0001 |
| Defendant | : | |

**MEMORANDUM**

Ditter, J.                                                                                                 June 27, 2013

      Plaintiff, Christopher Orji, has filed this employment discrimination action against his

former employer, the City of Philadelphia.[1]  Orji alleges that he was subject to gender

discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as well as

age discrimination and retaliation in violation of the Age Discrimination in Employment Act.

Orji also brings a cause of action for violation of the Pennsylvania Human Relations Act based

on unlawful sex and age discrimination.  Before me is the defendant's motion for summary

judgment, which I will grant.

## I.     FACTUAL BACKGROUND[2]

      Christopher Orji is a male who was born on December 31, 1958.  Orji began his

employment with the City, specifically the Office of Human Resources ("OHR"), on September

18, 1989.  Orji held multiple positions over the years, starting as a Personnel Analyst Trainee and

most recently holding the title of Hiring Services Associate 3 ("HSA 3").  In between, he held

---

[1] Orji filed his complaint against the City and the City of Philadelphia Office of Human Resources. Defendant filed a motion to dismiss the Office of Human Resources pursuant to Fed. R. Civ. P. 12(b)(6) on the basis that it is a department of the City that cannot be sued in accordance with state law.  *See* Dkt. 3.  Orji then voluntarily dismissed the action against the Office of Human Resources.  *See* Dkt. 5.

[2] Where the facts are agreed, I have not cited to the record.

the positions of Personnel Analyst 1, Personnel Analyst 2, HSA 2, and by temporary promotion, from late 2004 to early 2005, the position of Human Resources Technical Specialist–Compensation ("HRTS-C").  Except for the approximately six month period when he was in the HRTS-C role, Orji held the position of HSA 3 from 2000 until his employment with the City ended in October 2010.  In these various roles, Orji was responsible for reviewing materials submitted by applicants seeking jobs with the City, notifying those applicants as to their eligibility to compete for jobs, and administering civil service tests to applicants.  After failing to receive a promotion in early 2010 and the City's later decision to demote him, Orji resigned and his last day of employment with the City was October 22, 2010.

Orji contends that he had a "superior performance record for twenty years" until his 2009 annual performance report.  *Pl.'s Br.* at 1.  In support of that statement, Orji identifies his 2003 performance report where he was praised for his work ethic, quality of work, and team leadership, and given an overall performance rating of "superior."[3]  Orji then claims that this overall superior rating remained in place from 2003 until 2009, while he was in the position of HSA 3.  *Id.* at 3.  The record contains Orji's annual performance evaluations from 1989-1991, 1998, and 2000-2001, where in each he received an overall "satisfactory" rating.  A review of these reports reveals that Orji was rated "improvement needed" in at least one individual category for the years 1989, 1990, and 2000, and rated "superior" in one or more categories in 1990, 1991, 1998, 2000, and 2001.  The next report is the 2003 performance report with an overall "superior" rating, as mentioned above.  No other reports were provided by the parties,

---

[3] Performance reports for employees contain an overall rating and individual ratings for various performance factors.  The rating options consist of:  "Outstanding," "Superior," "Satisfactory," "Improvement Needed," and "Unacceptable."  Each employee receives a performance report on an annual basis, and they are completed by a "rater," then approved by a "reviewing officer" and signed by the employee.

and it is unclear whether any were prepared for those missing years, if they were unavailable to the parties, or whether the parties simply chose not to supply them as part of the record.

Michael McAnally was Deputy Personnel Director of the OHR and he supervised Orji in some capacity during Orji's employment with the City. The City contends that McAnally supervised Orji "both directly and indirectly from 2004 to October 2010," when Orji's employment with the City ended. *City's Statement of Material Undisputed Facts ("Def.'s Facts")* ¶ 24. Orji claims that he began to report directly to McAnally in June 2009 only when Orji's then-direct supervisor left OHR and no one else filled the position. *Pl.'s Br.* at 4; *Orji Dep.* at 45. As Orji's direct supervisor, McAnally was responsible for rating him and completing his 2009 annual performance report. The circumstances surrounding this report, a relevant performance evaluation immediately preceding the promotion Orji applied for in December 2009/January 2010, are disputed in some respects by the parties. The report gave Orji an overall "satisfactory" rating, an "improvement needed" rating in four individual categories, a "superior" rating in one category, and a "satisfactory" rating in the remaining fields. The report also included descriptions of mistakes made by Orji and general issues with his work performance.

Orji claims that this performance report, which was dated August 14, 2009, and was intended to cover his performance of the prior year (August 2008-July 31, 2009), was not actually transmitted to him at that time, and in fact, he "was not made aware that the performance report was available for viewing" until November 30, 2009, when McAnally followed up with him about the evaluation. *Pl.'s Br.* at 6. The City contends that the evaluation was prepared by McAnally on August 14, 2009, and evaluations were electronically available to employees via their in-boxes within the Oracle system. *Def.'s Facts* ¶¶ 45, 61.

Despite the disagreement as to when the evaluation was prepared and made available, it is uncontested that Orji did not actually review the report until December 2, 2009. Because Orji was surprised to see the negative comments about his work, he and McAnally met shortly thereafter. As a result of their discussion, McAnally submitted a revised performance report so that all ratings were "satisfactory" or above, and all negative comments were removed. *See Def.'s Br.*, Exh. 30 (annual report dated December 8, 2009 reflecting "satisfactory" ratings for all categories, except one "superior" rating); *see also id.* (memorandum to Orji from McAnally documenting meeting and agreement to revise his evaluation and remove all negative comments, but advising him that if his "performance remains satisfactory for the remainder of the rating period, these [negative] comments will be discarded" but if his "performance is not satisfactory, the comments will be used to document [his] next rating").

Meanwhile, sometime in the fall of 2009, McAnally went to the Human Resources Director, Albert D'Attilio, with a request to temporarily promote Patricia Fitzgerald, a Personnel Analyst 3 in the OHR department, to an open HRTS-C position as well as a request for authorization to announce a promotional examination for the permanent HRTS-C position.[4] D'Attilio granted both requests. Then, according to an e-mail dated December 3, 2009, McAnally asked Glenn Harper, Executive Assistant within OHR, to announce the HRTS-C exam, noting that Fitzgerald held the temporary position and that the "only other person who should meet the requirements is Chris Orji." *Def.'s Br.*, Exh. 33.

In late December 2009, OHR announced that the HRTS-C position was open, and department employees could submit an application for the job. *Id.*, Exh. 24. Orji applied for the position. With this particular promotion, a candidate was not required to sit for a written or oral

---

[4] The parties have not disclosed who, if anyone, filled the HRTS-C position from the time Orji left his temporary role in 2005 until the fall of 2009.

test. Rather, OHR administered a "modified training and experience evaluation," where only the candidate's training, experience, and seniority were considered. *Harper Dep.* at 38, 43. From those considerations, a score was computed and the eligible candidates ranked on an "eligibility list." Glenn Harper was responsible for making the initial eligibility determinations, administering the selection process, and producing the final list of eligible candidates. *Def.'s Facts* ¶ 104; *Harper Dep.* at 28.

As predicted, only two individuals were deemed eligible to compete for the permanent HRTS-C position, Orji and Fitzgerald, a female under the age of 40, who had been employed with OHR since June 2006.[5] After their scores were calculated, Orji ranked first in the order of eligibility. No interviews were conducted, but none were required according to the Civil Service Regulations ("CSRs") that were provided as part of the record. *See Def.'s Br.*, Exh. 37 (CSR 11.091 states that eligible candidates must be interviewed *except* for those who are "certified from a departmental promotional list and whose record of performance is personally known to the interviewer"). Also under the regulations, McAnally could choose either employee on the eligible list. *See id.* (CSR 11.031 states, "[w]here two (2) non-veterans are certified, either non-veteran may be appointed").

Orji did not receive the promotion. Instead, McAnally recommended Fitzgerald for the position and D'Attilio approved it. *D'Attilio Dep.* at 13. Orji was not informed by McAnally or D'Attilio that he did not receive the promotion; rather he "inadvertently learned" of it sometime in February 2010. *Pl.'s Br.* at 7; *Orji Dep.* at 128-29.

---

[5] No information was provided that describes Personnel Analyst 3, Fitzgerald's position prior to her promotion to HRTS-C, in terms of responsibilities or placement on a department hierarchy as compared to Orji's HSA 3 position. Fitzgerald testified only that the HRTS-C job was a level above Personnel Analyst 3, and that she and Orji worked in different "areas." *Fitzgerald Dep.* at 54.

In April 2010, Orji made a complaint to D'Attilio concerning McAnally and the circumstances of his being passed up for the HRTS-C promotion. D'Attilio testified that Orji complained about not being notified by McAnally or anyone else in the department that he did not receive the promotion. *D'Attilio Dep.* at 46-47, 53. D'Attilio assured Orji that he would speak to McAnally about Orji's feeling slighted for not being notified, and D'Attilio testified that he did follow up with McAnally. *Id.* at 53-54. According to plaintiff, however, D'Attilio never followed up with Orji after his conversation with McAnally, thereby leaving Orji without an explanation for not receiving the promotion. *Orji Dep.* at 132. It is uncontested that, at no point during this meeting, did Orji mention that he felt McAnally was discriminating against him on the basis of his gender, age, or any other impermissible factor.

On April 26, 2010, McAnally issued a written reprimand to Orji because of additional performance issues and in response to his performance deteriorating "[a]lmost immediately after the revised performance report was submitted" the previous December. *See Def.'s Br.*, Exh. 38. The memorandum outlined examples of various errors committed by Orji in determining the eligibility of candidates, something McAnally considered unacceptable given plaintiff's long tenure with the department. The cited errors took place from December 2009 through April 2010. Orji was informed that if his performance did not improve, "more severe disciplinary action [would] be imposed, up to and including dismissal." *Id.*

McAnally had completed a special performance report dated April 20, 2010, containing the comments that were originally part of the August 2009 evaluation, as well as the criticisms and mistakes listed in the contemporaneous April written reprimand. *See id.*, Exh. 39. Orji's overall rating was "improvement needed" with several areas downgraded to "improvement

needed" and even "unsatisfactory/unacceptable." Thus, Orji's new performance report was worse than the one McAnally originally prepared and dated August 14, 2009.

On August 31, 2010, McAnally issued another memorandum entitled "Disciplinary Action" that notified Orji of the intent to demote him to Personnel Analyst 2 because he was not adequately performing at the level of HSA 3. *Id.*, Exh. 41. That memorandum detailed additional mistakes, committed in May and August 2010, with respect to determining candidate eligibility and announcing examinations, principally focusing on errors Orji allegedly committed with respect to a Library Assistant exam. Furthermore, the memorandum notified Orji of his right to a departmental hearing prior to receiving the notice of involuntary demotion. The basis for the demotion was stated as, "You have not performed at an advanced level, have not demonstrated proficiency in your work, and require close supervision for all assignments. You are not functioning at the level of a Hiring Services Associate 3." *Id.*

Three days later, Orji submitted a memorandum to D'Attilio that requested a hearing, provided notice of his resignation pending the outcome of the hearing, and described what Orji believed were discriminatory practices on the part of McAnally. *Id.*, Exh. 43. First, Orji stated that McAnally had been "moving [him] around within the Hiring Services Division to conceal his discriminatory promotional practices against [him] and to set [him] up for this [demotion]." *Id.* Next, Orji disputed any alleged mistakes related to the Library Assistant examination as well as other eligibility determinations cited in the August 31 memorandum. He contended, *inter alia*, that it was McAnally who directed him to act in a particular way or who actually approved exams only to later blame Orji for the errors. Orji then stated, "I should have been promoted to the [HRTS-C] if [McAnally] had not discriminated against me." *Id.* As for his decision to resign, Orji wrote, "[t]his response serves as a formal submission of letter of resignation of my

employment with the City of Philadelphia pending on the outcome of this requested hearing. I would rather resign my employment with the City of Philadelphia and pursue any other available options than to be subjected to this agony and humiliation." *Id.*

Shortly thereafter, a second HRTS-C position became available and Maria Agelakis-Ramos, a female under age 40 who was an OHR employee, was promoted to the position. Orji did not apply for the promotion, but he believed that he was eligible because he was already on the HRTS-C eligible list that had been published prior to the first HRTS-C promotion decision in January 2010. *Orji Dep.* at 136.

On September 29, 2010, a hearing on Orji's demotion took place that was attended by Orji, McAnally, D'Attilio, and Brian Albert, OHR's Human Resources Deputy Manager. Orji claims that he disputed all accusations that his job performance was not at the level of HSA 3. *Compl.* ¶ 26. Nevertheless, on October 13, 2010, Orji received a notice that the City intended to demote him to the position of Personnel Analyst 2. *Compl.*, Exh. E. That notice contained a section, authored by D'Attilio, with the reasons for the demotion. D'Attilio noted that during the hearing Orji disputed the Library Assistant mistakes, but his explanation did not adequately address the errors he was accused of committing. Moreover, Orji claimed that his former supervisor, Heather McCaffrey, instructed him to approve candidates in violation of the requirements, but Orji "offered no proof to this assertion and Heather has denied [the] allegation." *Id.* D'Attilio concluded that he agreed "with the recommendation as detailed in the August 31, 2010 memo that your performance is not at the level of Hiring Services Associate 3." *Id.* The demotion was to be effective on October 23, 2010. Instead of accepting the demotion, Orji made October 22, 2010 the effective date of his resignation.

## II.    <u>STANDARD OF REVIEW</u>

The standard for summary judgment is well established.  I must consider the evidence in the light most favorable to the non-moving party.  If there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate.  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.

However, the non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions to defeat a summary judgment motion.  Here, Orji must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  He "must present affirmative evidence in order to defeat a properly supported motion" and cannot "simply reassert factually unsupported allegations." *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989).  He cannot "merely rely upon conclusory allegations in [his] pleadings or in memoranda and briefs." *Harter v. GAF Corp.*, 967 F.2d 846, 852 (3d Cir. 1992).

## III.    <u>DISCUSSION</u>

### A.    <u>Gender and Age Discrimination</u>

Orji brings a claim of discrimination on the basis of his sex under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*., which prohibits an employer from discriminating against an individual based on race, color, religion, sex, or national origin.  He also brings an action alleging age discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*  The ADEA prohibits an employer from discriminating against any individual in hiring, termination, compensation, or conditions of employment because of that

individual's age. Additionally, Orji seeks relief under the Pennsylvania Human Relations Act ("PHRA") based on unlawful sex and age discrimination. *See* 43 P.S. § 951, *et seq.*[6]

Orji does not argue that there is direct evidence of discrimination; therefore he may present circumstantial evidence of unlawful employment practices, and that evidence will be considered under the familiar three-stage *McDonnell Douglas* burden-shifting analysis. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see also Ullrich v. U.S. Sec'y of Veterans Affairs*, 457 Fed. Appx. 132, 138 (3d Cir. 2012) ("The same evidentiary framework is used to evaluate claims of discrimination based upon sex and age.").[7]

To survive a motion for summary judgment in an employment discrimination case under Title VII and the ADEA, Orji must first come forward with evidence to establish a *prima facie* case of discrimination. Orji must demonstrate that (1) he is a member of a protected class;[8] (2) he is qualified for the position; (3) he suffered an adverse employment action; and (4) similarly situated individuals not of the protected class were treated more favorably or the circumstances

---

[6] Orji's PHRA claims are evaluated under the same framework as the federal statutes.

[7] The typical burden-shifting framework of *McDonnell Douglas* also applies to Orji's claim of age discrimination under the ADEA. The City cites *Gross v. FBL Financial Servs., Inc.*, 557 U.S. 167 (2009) and its holding that a plaintiff seeking redress under the ADEA must prove by a preponderance of the evidence (either direct or circumstantial) that age was the "but-for" cause of the adverse action. However, *Gross* does not render the *McDonnell Douglas* analysis inapplicable to the ADEA. *See Smith v. City of Allentown*, 589 F.3d 684, 690-91 (3d Cir. 2009) (finding "the but-for causation standard required by *Gross* does not conflict with our continued application of the *McDonnell Douglas* paradigm in age discrimination cases"). Indeed, the *Smith* Court found that use of the *McDonnell Douglas* standard did not offend the holding in *Gross* because "the burden of persuasion, 'including the burden of proving "but for" causation or causation in fact, remains on the employee.'" *Id.* at 691 (internal quotations and citations omitted). Thus, I will analyze Orji's age and gender claims together, unless I note otherwise. Since plaintiff does not point to sufficient evidence for a fact-finder to reasonably conclude that either his gender or his age were a motivating or determinative factor in the employment actions at issue, he necessarily fails to point to sufficient evidence that his age was the but-for cause.

Furthermore, because I ultimately find that plaintiff's age and gender discrimination claims do not survive summary judgment, there is no need to address the dispute between the parties as to whether plaintiff can plead both age and gender discrimination at the same time.

[8] For a claim of age discrimination, the protected class includes individuals over the age of 40. *Windfelder v. May Dep't Stores Co.*, 93 Fed. Appx. 351, 354 n.2 (3d Cir. 2004).

of the adverse employment action otherwise give rise to an inference of unlawful discrimination. *See Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410-11 (3d Cir. 1999).

If Orji establishes a *prima facie* case, the burden of production then shifts to his employer, the City, to articulate some legitimate, nondiscriminatory reason for his rejection. If the City does so, the burden of production shifts back to Orji for the third stage of the *McDonnell Douglas* analysis, where he must point to sufficient evidence from which a fact-finder could reasonably conclude that the legitimate reasons offered by the City were not its true reasons, but were a pretext for discrimination. *See Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). At all times, the burden of persuasion rests with Orji.

### 1. <u>Discriminatory Failure to Promote – January 2010</u>

#### a. *McDonnell Douglas'* First Stage: *Prima Facie* Case of Gender and Age Discrimination

Orji first claims that the City discriminated against him because of his age and gender by failing to promote him to the position of HRTS-C in January 2010. For purposes of summary judgment, the City concedes the first and third elements of a *prima facie* case – that is, Orji was a male over the age of 40, and therefore a member of a protected class, and he suffered an adverse employment action when he was rejected for the promotion. *Def.'s Br.* at 7. The City contests, however, whether Orji was qualified for the promotion and whether he has pointed to evidence that similarly situated persons not of his protected class were treated more favorably. *Id.*; *Def.'s Supp. Br.* at 7. Thus, the City contends that Orji has not shown a *prima facie* case of discrimination with regard to the denial of this promotion. I disagree.

Orji has shown that he was among the individuals eligible for the promotion, and in fact ranked first on the list of candidates, and was actually considered by the City for the position. *See Ezold v. Wolf, Block, Shorr, and Solis-Cohen*, 983 F.2d 509, 523 (3d Cir. 1992) (holding that

a plaintiff satisfies his or her *prima facie* burden to show he or she was qualified if he or she was among those from a selection for promotion was made).  Indeed, the City concedes that Orji met the minimum grade level, education, and experience requirements, and that his overall performance ratings, at that time, had been satisfactory or higher.  *See Def.'s Br.*, Exh. 24 (HRTS-C job description including minimum requirements); *McAnally Dep.* at 7 (referring to Orji's consideration for this HRTS-C position, stating, "[i]f you compare his education and experience with the requirements for the class specification, he would meet the requirements").  Thus, Orji has shown he was qualified for the promotion for *prima facie* purposes.[9]

Turning then to the fourth element of his *prima facie* case, Orji identifies Fitzgerald as his comparator who was treated more favorably.  "Though 'similarly situated' does not mean 'identically situated,' a plaintiff must demonstrate that [he] is similar to the alleged comparator in relevant respects," that is title, grade level, responsibilities, duties, and performance.  *Warfield v. SEPTA*, 460 Fed. Appx. 127, 130 (3d Cir. 2012).  Additionally, a plaintiff must show that the similarly situated individual was treated more favorably, with the inquiry focused on "the particular criteria or qualifications identified by the employer as the reason for the adverse action."  *Id.* (quoting *Simpson v. Kay Jewelers*, 142 F.3d 639, 647 (3d Cir. 1998)).

Because Fitzgerald is a female who was under the age of 40 at the time of the promotion, she is a person outside of Orji's protected class, and because she ultimately received the promotion over Orji, she received more favorable treatment.  The issue then is whether Fitzgerald and Orji were similarly situated in "relevant respects."

---

[9] The term "qualified" can have two meanings.  For *prima facie* purposes, "qualified" means the individual had the minimum requirements that made him eligible for the job (education, position, experience, etc.).  Whereas "qualified" in the sense that an individual was capable of performing the job well, or was the best candidate for the job, is an issue to be discussed below in the second stage of the *McDonnell Douglas* analysis.

The City argues that Fitzgerald and Orji were not similarly situated because she did not have work performance problems, while Orji did. *Def.'s Br.* at 7. The City specifically points to the fact that "Orji had two consecutive poor performance evaluations." *Id.* It also cites Orji's performance on two promotional exams in 2008 and 2009, not for the HRTS-C position but different positions, where Orji received a score of "improvement needed," as well as McAnally's observation of problems with Orji's performance dating back to 2004. Conversely, the City claims that Fitzgerald did not make a mistake during her employment and she was never disciplined. The City also notes that Fitzgerald provided training for her peers, revised a "Classification and Compensation training manual," and "pursued further education in compensation by obtaining certificates." *Id.* at 8.

Viewing the facts in the light most favorable to Orji, and considering his *prima facie* burden is not high, I conclude for purposes of this motion that Orji has shown that he and Fitzgerald were similarly situated. Orji claims, and the City does not contest, that he never received any written reprimands, disciplinary action memoranda, or performance reports with anything less than overall ratings of "satisfactory" as of January 2010. *See Pl.'s Br.* at 14.

In addition, Orji and Fitzgerald were similarly situated in the aspects of education and experience. Orji too obtained further education by attaining Master's and Doctorate degrees in management areas of study while employed with the City. As to experience, Orji had been employed with the City for 20 years, in comparison to Fitzgerald's less than four years' experience. I do not consider the other differences referenced by the City sufficient to differentiate Orji from Fitzgerald in any relevant respect. As to the relevant aspects, such as education, experience, and position, Orji and Fitzgerald were similarly situated. Indeed, the fact

that Orji was actually considered by the City for the promotion, at the same time it considered Fitzgerald, is conclusive.

Because Orji has shown that he was eligible and considered for the promotion to HRTS-C, but a similarly situated female under the age of 40 was chosen for the promotion over him, Orji has satisfied the fourth element of his *prima facie* case and he has therefore met his burden under the first phase of the *McDonnell Douglas* analysis.

### b. *McDonnell Douglas'* Second Stage: Legitimate, Non-discriminatory Reasons

Turning to the second stage of the *McDonnell Douglas* framework, the City contends that it had three, non-discriminatory reasons for not promoting Orji to the HRTS-C position: Orji's prior performance, his recent performance, and the fact that Fitzgerald was a better candidate.

The City first cites to the issues Orji experienced in 2004 and 2005 while temporarily promoted to the HRTS-C position, and the decision not to promote Orji to the permanent HRTS-C position after his six-month term. In support of that decision, the City cites an example of a mistake Orji made when he was conducting a survey to determine the salaries of City of Philadelphia employees and he incorrectly researched how much city employees outside the United States were paid. *Def.'s Br.* at 9; *see McAnally Dep.* at 38-39. The record also contains a coaching memorandum and notes from meetings between Orji and McAnally discussing additional errors Orji made during this temporary appointment. *See Def.'s Br.*, Exh. 26-28.[10]

---

[10] Those exhibits contain the following documents:

(1) January 2005 coaching session memorandum to Orji from McAnally citing mistakes Orji was alleged to have made in two surveys.

(2) Notes from a meeting with Orji in March 2005 where they discussed Orji's performance problems. The notes list five examples of problems, such as incorrect job matching when completing surveys and errors with cost estimates. According to the notes, McAnally told Orji if he wanted to work as a compensation specialist he would have to improve his performance.

(3) Handwritten notes dated June 2005, documenting "obvious errors" Orji was accused of making in calculating a cost estimate. The notes state that McAnally spoke with Orji about the mistake and Orji did not seem to understand the explanation.

Ultimately, the City contends that McAnally and the then-deputy director decided not to permanently promote Orji because he "demonstrated that he was unable to perform at this level of work." *Def.'s Br.* at 9; *see McAnally Dep.* at 36.

The second reason given by the City for not promoting Orji were the mistakes that were detailed by McAnally in his August 14, 2009 annual evaluation. The report gave Orji an overall "satisfactory" rating, and an "improvement needed" ranking in four categories – quality of judgment, communication, exercising professional and technical skills, and following policies and procedures. *See Def.'s Br.*, Exh. 29. That document, according to defendant, cited "weaknesses in his performance and provided specific examples of situations in which Orji made mistakes." *Def.'s Br.* at 9.

By way of illustration, the City cites as one of those mistakes a time when Orji proposed a consolidation of pay range nine and pay range twelve classes, although the largest increase that could be approved pursuant to the Civil Service Regulations was two ranges – a regulation that, in the City's view, Orji should have been familiar with. McAnally also noted that Orji had "made several errors in eligibility determination," citing the Forensic Service Supervisor examination where Orji initially approved an applicant who "clearly lacked the years of specific service," and noting that "[i]nterpretation of the requirements was not required; all you had to do was compute years of experience and you failed to do so." *See id.*; *Def.'s Br.*, Exh. 29. [11]

---

[11] Other specific mistakes and issues listed in the performance report included:

(1) In February 2009, McAnally requested information from Orji regarding the minimum requirements he proposed for the Nutritionist class, but had yet to receive a reply.

(2) McAnally stated that he had given Orji explicit instructions on assignments, only to have Orji ignore those directions. Specifically, McAnally asked Orji to send supplemental questions to two applicants who appealed their disapproval by the Health Department, but instead Orji sent the questions to three applicants who had already been approved.

(3) Plaintiff spent significant time since November 2008 working on a classification survey for the Revenue Department, but had not yet completed it and McAnally had reviewed it twice making extensive changes.

In addition to listing specific instances of errors in the evaluation, McAnally also provided more general comments on Orji's work performance. For example, McAnally noted that as to the communication issues, "I do not believe that you are being insubordinate, but rather that you do not listen, do not fully understand instructions and do not ask any questions to clarify your understanding." *Def.'s Br.*, Exh. 29. He also wrote, "[y]ou have made mistakes out of carelessness and failure to adhere to set procedures…." *Id.* In conclusion, McAnally stated that, "[i]t is totally unacceptable for an analyst with almost twenty years of experience to perform at this level…Based on the quality of your performance, I am not confident that you will provide correct guidance to other analysts." *Id.* McAnally then instructed Orji to stop working with other analysts and to focus on improving his own work.

The City also points out that although McAnally revised the August 14, 2009 performance report after meeting with Orji in December 2009 in order to give him an opportunity to improve, Orji made another mistake in determining eligibility for exams, resulting in either applicants taking the exam in error, because they were not qualified, or the removal of qualified applicants from eligibility lists. *Def.'s Br.* at 10. Moreover, the April 2010 written reprimand, and the special performance report issued around the same time, include references to mistakes made in November and December 2009 and January 2010 with respect to eligibility

---

McAnally noted that the report was "poorly organized, inadequately documented, needlessly repetitive and grammatically incorrect throughout."

(4) With respect to the announcement for the Certified Registered Nurse exam, Orji did not include necessary information and he made errors in the language of the announcement.

*See also Def.'s Br.*, Exh. 30 (undated memorandum from McAnally to Orji that refers to their meeting and McAnally's agreement to submit a revised 2009 performance report and attaches a June 2009 memorandum prepared by Orji on a survey done for the Revenue Department with McAnally's handwritten comments, including a note that says, "Chris – this report would be unacceptable for a trainee. You have 20 years of experience and should do much better. You should at least follow the report format").

determinations, and they also refer to complaints received from an applicant and another human resources manager concerning Orji's alleged mistakes. *See Def.'s Br.*, Exh. 38-39.

Finally, McAnally testified that he chose Fitzgerald for the position because of "the quality of performance, the potential and the capability to continue to improve in the job." *McAnally Dep.* at 80-81. In addition, D'Attilio testified that Fitzgerald was "very talented and competent," whereas "Orji was a candidate…who we were having some difficulty with. He was prone to make mistakes, so when you compared the two, there wasn't much need of a discussion." *D'Attilio Dep.* at 15.

Given these cited reasons, I find that the City has pointed to sufficient evidence of legitimate, non-discriminatory reasons for not promoting Orji to the HRTS-C position.

### c. *McDonnell Douglas'* Third Stage: Pretext

Because the City has pointed to legitimate, non-discriminatory reasons for not promoting Orji, the burden shifts to him to point to evidence from which a fact-finder could reasonably conclude that those reasons are a pretext for age or gender-based discrimination. He may do this by pointing to evidence that either discredits the City's proffered reasons or would allow a fact-finder to reasonably conclude that discrimination more likely than not was the motivating or determinative cause, or for his age discrimination claim the but-for cause, of the failure to promote.

> (1) <u>Disputing some of the mistakes and criticisms cited by the City does not show they are pretextual.</u>

The first reason given by the City was Orji's poor performance when he previously had the HRTS-C position. As to those issues, Orji merely states that it was five years before the

denial of promotion at issue, and that it is not surprising that there would be problems raised from that period since that was also a time when McAnally was directly supervising Orji.[12]

However, Orji misses the point. The City asserts that it considered Orji's performance in a position, albeit years prior, that happened to be the same one he was seeking. The evidence of performance problems to which the City has pointed to that Orji experienced while temporarily serving in the HRTS-C role in 2004-2005, as well as the department's decision not to permanently appoint him to that position, are certainly relevant to the decision to deny him a promotion to the same HRTS-C role, and Orji has not pointed to any evidence suggesting this reason was pretextual. In fact, evidence of Orji's deficiencies while he temporarily held the HRTS-C position contradict his claim that the City later manufactured performance issues to prevent his promotion in January 2010.

The second reason given by the City for not promoting Orji were the mistakes he made as detailed by McAnally's evaluations. Although Orji does not specifically address any mistakes cited in the initial, August 2009 performance report in his response brief, his deposition testimony reveals that he contests only one alleged mistake – that related to the Forensic Service Supervisor examination. *See Orji Dep.* at 48-55, 74-80 (testifying that McAnally told him to look for outside candidates for this position even though it was originally only a position for internal promotion).

Regarding the mistakes listed in the April reprimand, Orji argues that he has "articulated clear and credible explanations for all such unjustified criticisms." *Pl.'s Br.* at 16. Orji further claims that "it was his job to apply the City's eligibility requirements according to his judgment and according to the proper specifications for the jobs and he did so." *Id.* at 18. Orji did testify

_____

[12] Despite this argument, Orji does not claim that he lodged a complaint after McAnally's decision at that time that he was not up to the task of taking the permanent HRTS-C job.

at his deposition contesting each of the alleged mistakes in the April 2010 reprimand, including the Social Worker Trainee exam in December 2009, and the Environmental Health Program Manager exam in January 2010, where he was alleged to have admitted candidates who were not qualified. *See Orji Dep.* at 63-64, 167, 170-71 (testifying that he worked with the Health Department to confirm that the Environmental Health Program Manager candidate was on the promotional track, and that there was no clear equivalency standard for defining what "related field" meant in the education requirements for Social Worker Trainee, so he had to determine whether a degree was acceptable on a case-by-case basis); *see also Def.'s Br.*, Exh. 43. Orji has also pointed to e-mail communication among himself, McAnally, and a human resources manager in the Department of Human Services concerning what degrees would be acceptable for the Social Work Services Trainee exam. *See Pl.'s Br.*, Exh. 4. Furthermore, Orji claims that he will present evidence at trial that will show weaknesses and implausibility in the City's cited mistakes concerning removing names from eligibility lists, especially considering the removal of names from eligibility lists is a common practice. *Pl.'s Br.* at 7-8, 18.[13]

In addition to Orji's claim that he did not make certain mistakes, he contends that McAnally "commenced a specific course of conduct to excessively criticize" him because McAnally knew Orji would rank ahead of Fitzgerald. *Id.* at 5. First, Orji cites as evidence of the illegitimacy of McAnally's criticisms, McAnally's immediate agreement to change the 2009 performance report, which contained four areas of "improvement needed," after the two met in December. *Id.* at 16. Orji also points to the fact that the performance report was dated August

---

[13] Orji cites D'Attilio's deposition for the City's acknowledgement that names are often removed from eligible lists. *See Pl.'s Supp. Br.* at 7. However, a review of that testimony reveals that D'Attilio actually testified that the removal of names from eligible lists was *not* a common occurrence. *See D'Attilio Dep.* at 58-59 ("Q: In the case of those other employees were there ever situations where individuals had to be removed from eligible lists? A: It's not a common occurrence. Q: Has it ever happened? A: Yes."). In fact, D'Attilio testified that Orji "kept making the same mistakes over and over again on eligibility. He far exceeded the errors of any other analyst in the department…." *Id.* at 59.

14, 2009 but not brought to Orji's attention until the end of November 2009 and there is no documentation that it was ever transmitted to Orji in August. From this, Orji surmises that McAnally did not actually draft the evaluation in August as the date suggests, but rather prepared the negative report to coincide with the announcement of the open HRTS-C position in December, which had already been earmarked for McAnally's "special protégé." *Id.* at 5-6, 17.[14] Finally, Orji argues that his long history of excellent work performance prior to McAnally becoming his supervisor casts doubt on the genuineness of McAnally's criticisms. *Id.* at 17.

None of Orji's arguments demonstrate that the City's reasons for denying Orji the HRTS-C promotion were pretextual. To begin with, whenever the initial, critical 2009 review was prepared, all ratings were eventually revised to at least "satisfactory" and all negative comments were removed. No fact-finder could reasonably find that McAnally's willingness to change an evaluation in a positive way, without evidence from Orji to sufficiently undermine those alleged mistakes, is evidence of pretext. Orji does not claim that his evaluation, either the initial or the revised version, precluded him from being considered for the promotion, or somehow altered his score. In fact, he actually scored higher than Fitzgerald.

Moreover, contrary to Orji's contention that his performance was highly regarded and then he suddenly received a poor performance evaluation, McAnally initially provided Orji with a "satisfactory" evaluation but noted areas of improvement. He later revised that evaluation to eliminate any negative comments. This is hardly evidence of a drastic and unexplained change and Orji offers nothing but his speculation that any criticism he may have received was due to McAnally's desire to promote younger women to Orji's detriment. No fact-finder could

---

[14] The City's position is that McAnally prepared Orji's evaluation on August 14, 2009 and it was available to him, as with all employees, via his in-box within the Oracle system and employees accessed the Oracle database on a daily basis. *Def.'s Facts* ¶¶ 45, 61-62.

reasonably find Orji's performance history and speculative belief to be sufficient evidence of pretext.

More importantly, the mistakes Orji was accused of making and the negative comments that were part of the original evaluation, regardless of when they were codified in writing or why they were revised, reflected his supervisor's view of his work performance at the time. The initial 2009 evaluation contained approximately six examples of mistakes that Orji was accused of making throughout the previous year and generally discussed the weaknesses in Orji's work. Additionally, the April written reprimand and special performance report, though issued after the promotion decision, referred to several mistakes Orji was accused of making in November and December 2009 and January 2010.

Orji has addressed only one of the mistakes mentioned in his initial, August 2009 performance evaluation and he has not responded to some of the general criticisms concerning his work performance, such as his poor communication skills and mistakes made due to carelessness. Moreover, Orji has not pointed to anything suggesting that the City has fabricated the fact that complaints were received about his performance. Although Orji disputes some of the mistakes cited by the City in the April reprimand, and even if the City was wrong in identifying them as mistakes, and even if he can show the removal of names from eligible lists was a common practice, it is not sufficient to call into question all of the reasons cited by the City for failing to promote him. After all, the issue is not whether the City's business decision was "wise, shrewd, prudent or competent," but whether it was motivated by discriminatory animus. *See Jones*, 198 F.3d at 413.

To discredit the City's reasons, Orji would need to demonstrate that that the City's explanation was "not merely wrong, but that it was 'so plainly wrong that it cannot have been the

employer's real reason.'" *Id.* (internal citations omitted). In other words, Orji would need to "present sufficient evidence to meaningfully throw into question, i.e., to cast substantial doubt upon," the City's proffered reasons for his denial of promotion. *See Fuentes*, 32 F.3d at 765. To do this, Orji must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the proffered reasons that a reasonable fact-finder could find them "unworthy of credence." *Jones*, 198 F.3d at 413 (quoting *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108-09 (3d Cir. 1997)).

In sum, I find that Orji has not cast substantial doubt on the reasons cited by the City, or even a portion of them that undermine their credibility and thus demonstrate pretext. *See Kautz v. Met-Pro Corp.*, 412 F.3d 463, 476 (3d Cir. 2005) (plaintiff's burden to demonstrate that each of the defendant's proffered reasons are pretextual "can be done by showing that some of the employer's proffered reasons are a pretext in such a way that the employer's credibility is seriously undermined, therefore throwing all the proffered reasons into doubt").[15]

(2)  Orji's argument that women, and Fitzgerald specifically, were treated more favorably does not show his denial of promotion was discriminatory.

Orji contends that the third reason given by the City for promoting Fitzgerald – that she was a better candidate – is pretextual, and in support he argues that young women were favored in the department, and more specifically, McAnally favored Fitzgerald and provided her with more opportunities than Orji.

---

[15] Although it is unclear from a review of Orji's response briefs, to the extent he is claiming that McAnally's unjustified criticisms, or a pattern of criticisms, immediately preceding the City's later decision to demote him (e.g. the issues with the Library Examination in August 2010) are somehow evidence of pretext for discrimination with respect to the denial of promotion months earlier, I reject that argument as no reasonable fact-finder could conclude that such evidence is probative of discrimination. Any criticism from that time would be relevant to whether the later employment action, the City's decision to demote Orji, was discriminatory or retaliatory, and I discuss the viability of those claims below.

Orji argues the fact that young women were favored in the OHR is evidence that Fitzgerald was promoted not because she was a better candidate but because she was a young woman. Orji claims that McAnally overwhelmingly promoted women since being named Deputy Personnel Director in 2008, and "during Orji's tenure, [he] never promoted a man to a management level position; he only promoted women." *Pl.'s Br.* at 4. In support of that claim, Orji points to D'Attilio's deposition testimony where he was asked if he was aware of any men promoted by McAnally since 2008. *See D'Attilio Dep.* at 77-79. D'Attilio responded that, other than people who had been promoted from the trainee position after a year of satisfactory performance and another man, Richard DiLorenzo,[16] he could not recall any other promotions. Orji also cites Glenn Harper's testimony recalling the promotions of approximately six individuals, only one of whom was a male, to senior level positions. *Pl.'s Br.* at 17; *see Harper Dep.* at 96-97.

The City responds that at the time Fitzgerald was promoted, there were more women than men working in OHR and the Hiring Services Division. *Def.'s Facts* ¶ 223. The City has offered evidence that there were 80 female human resource professionals employed by the City in 2010, compared to 30 men. *Id.* ¶ 226; *Def.'s Br.*, Exh. 56-58. Moreover, the record shows that the number of women working in OHR was nearly twice the number of men in 2009 and 2010, and therefore, by the very nature of things, there were more women than men who would have been eligible for a promotion. *See Def.'s Br.*, Exh. 58. The City also claims that it has

---

[16] Addressing DiLorenzo specifically, Orji claims that he was promoted in September 2010, only after Orji complained about discrimination. He also notes that DiLorenzo had performance issues, including a warning related to unauthorized absences from work. *See Pl.'s Br.*, Exh. 5 (including written warnings from 1998-2000 regarding lateness or absenteeism; specifically noting that the warnings were not a condemnation of his work). Thus, Orji concludes that a jury could reasonably find that DiLorenzo's promotion was only a reaction to Orji's complaints of discrimination. This is pure speculation by Orji.

identified several men that McAnally hired and promoted to management level positions prior to Orji filing his complaint. *Def.'s Supp. Br.* at 3; *see also Def.'s Facts* ¶¶ 26-27.

The evidence that Orji points to is not probative of gender discrimination by McAnally or the City. Orji does not point to evidence of the number of men versus women who applied for positions or of those applicants, which ones were actually qualified for such promotions. He does not cite to any specific cases, other than his own, where a woman was promoted over a man. While "statistical evidence of an employer's pattern and practice with respect to minority employment may be relevant to a showing of pretext," Orji's raw numerical comparisons "not accompanied by any analysis of either the qualified applicant pool or the flow of qualified candidates over a relevant time period" offer no probative value. *See Ezold*, 983 F.2d at 542-43.

Orji repeatedly cites Fitzgerald's lack of experience in years compared to his own. However, just because Orji had more experience, he was not necessarily a better candidate for promotion and, by the same token, the fact that a person with less experience received the promotion, is not *per se* evidence of discrimination because of Orji's gender or age.

The mere fact that a woman received a promotion over a man is not dispositive of gender discrimination. Nor is the fact that a younger person received the promotion instead of someone older sufficient in and of itself to show discriminatory animus based on age. Moreover, that McAnally liked Fitzgerald, was "actively encouraging" her advancement, and "desire[d] to see" her succeed, without more, is not indicative of discrimination against Orji because of his age or gender. *See Pl.'s Br.* at 4 (citing *Fitzgerald Dep.* at 8, 52-53, 111-12).[17]

_____

[17] Orji also argues that McAnally did not provide him with "similar opportunities" as he offered Fitzgerald, citing her pursuit of education and placement on "certain committees." *Pl.'s Br.* at 17. However, Orji's own testimony reveals that he too obtained further education and he was appointed to the City's "pay evaluation team" by McAnally. *See Orji Dep.* at 21-24, 30.

Because Orji and Fitzgerald were both eligible for the position, McAnally could choose either one, according to Civil Service Regulations. Despite Orji's belief that he should have been chosen because he was number one on the list, the choice for promotions was at McAnally's discretion. *See Orji Dep.* at 14-15. Moreover, Orji's complaint that he "was not even offered an interview" is baseless considering the regulations do not require interviews of candidates when the interviewer is familiar with their work performance. *See Def.'s Br.*, Exh. 37 (CSR 11.091).

Orji has not pointed to any evidence that Fitzgerald was not qualified for the promotion or that she was accused of making mistakes or experiencing performance issues. In sum, Orji has not pointed to evidence that contradicts the City's position that Fitzgerald was simply "a better candidate for the position than Orji" and that his superiors believed Orji's "performance was lacking and below the standard for an advanced performance level employee." *Def.'s Facts* ¶¶ 127-130; *see McAnally Dep.* at 81; *D'Attilio Dep.* at 15.

For the reasons discussed above, Orji's claim that the City's failure to promote him in January 2010 showed he was a victim of gender or age discrimination must be denied.

2. <u>**Discriminatory Notice of Intent to Demote**</u>

Orji also claims that the City's decision to demote him from HSA 3 to Personnel Analyst 2 was motivated by or because of his gender and age. Referring again to the *McDonnell Douglas* three-stage burden-shifting framework, I must first determine if Orji has satisfied his initial burden of establishing a *prima facie* case of gender and age discrimination. Orji has demonstrated that he is a member of a protected class because he is a man and over the age of 40, and that he suffered an adverse action when the City decided to demote him. I will assume for purposes of deciding the present summary judgment motion that he was qualified for the

position as there is no contention that he did not meet the minimum education and experience requirements for the position he held prior to the demotion decision.

Nonetheless, as to the fourth prong of the *prima facie* case, Orji has not pointed to any evidence or identified any circumstances surrounding the decision to demote him to Personnel Analyst 2 that suggest an inference of gender or age discrimination. For example, Orji does not point to evidence that similarly situated females or younger individuals were disciplined differently for similar allegations of mistakes and performance problems. He does not identify anyone outside his protected class that the City, or McAnally specifically, did not seek to demote despite having a similar work history as Orji. Furthermore, Orji does not argue that a female or younger individual replaced him in the HSA 3 position. Nor does he point to any discriminatory comments made at the time McAnally recommended him for demotion or during the demotion process. These are by no means the only methods of setting forth evidence to satisfy the fourth prong of plaintiff's *prima facie* case, but are demonstrative of the arguments typically made by plaintiffs in discrimination cases. Here, Orji has not pointed to any evidence from which to base his *prima facie* case under the *McDonnell Douglas* analysis, thus, the burden does not shift to the City and it is unnecessary to discuss any legitimate non-discriminatory reasons for his demotion or any evidence Orji may have that those reasons are pretextual. Therefore, I must grant summary judgment as to Orji's claim that the City's decision to demote him was based on gender or age discrimination.

### 3. Other Adverse Employment Actions

#### a. Failure to Promote – September 2010

Orji clams that sometime after he submitted his September 3, 2010 memorandum that responded to McAnally's August 31, 2010 notice of demotion, but prior to the September 29

hearing being scheduled, a second HRTS-C position became available. He states that "[d]espite continuing to rank number one on the eligible list for the HRTS-C position, Mr. Orji again was not offered an interview." *Pl.'s Br.* at 9. Instead, Maria Agelakis-Ramos, a female under the age of 40 at the time, was temporarily appointed to the position on September 20, 2010, and later permanently promoted. Orji also claims that Agelakis-Ramos ranked behind him on the eligible list and had less experience, as she joined the City in 2006.

The City contends that Orji did not apply for this position, and of the applications Harper received, he determined that the only person eligible for the position was Agelakis-Ramos. *Def.'s Facts* ¶¶ 211, 213;[18] *Harper Dep.* at 71. Because OHR considered the competitive process for this position as separate from the December 2009 competitive process, the City asserts that Orji was required to apply for this HRTS-C position. *Def.'s Facts* ¶ 214; *Harper Dep.* at 75-77. Orji admits that he did not apply, as he testified that he "did not apply for that position, because I was already on the list for that position. Why would you test me twice?" *Orji Dep.* at 136. Indeed, the eligible list for the HRTS-C position that was prepared in January 2010, ranking Orji ahead of Fitzgerald, says that it "expires" on January 27, 2012. *See Def.'s Br.*, Exh. 36.

Despite Orji's contention that he should have been considered for the position, Orji was not eligible for this promotion, and I conclude as much for reasons other than those argued by the City. Even if Orji's name was still on an unexpired eligibility list, he had resigned from the City on September 3, 2010 and the hearing that might have caused him to withdraw his resignation had not been held. *See id.*, Exh. 43. Therefore, as of September 20, 2010, his resignation stood.

---

[18] The City refers to evidence in the record related to Orji's failed attempt to pass the HRTS Hiring Services examination in September 2010. As Orji does not allege any discriminatory conduct with respect to this position in his complaint or response briefs, it is not at issue.

Additionally, the HRTS-C job description provided as part of the City's evidence lists the minimum requirements for eligibility, including present employment with the City and a most recent performance rating of satisfactory or higher.  *Id.*, Exh. 54.  Since Orji's latest evaluation from April 2010 gave him an overall rating of "improvement needed," which Orji does not contest, he would not have been eligible for the promotion.  *See id.*, Exh. 32 (CSR 9.0231 states that "[a] performance rating of less than satisfactory shall disqualify the competitor from competing in the examination and from having his or her name appear on the eligible list").  Orji, through his own conduct, was not in the running for the promotion and cannot therefore make out a *prima facie* case of discrimination based on the failure to promote him to HRTS-C in September 2010.

### b.  Constructive Discharge

Orji contends that he has established a claim for constructive discharge based the fact that he was threatened with discharge, he was notified of the City's intent to demote him to a less desirable position, his job responsibilities were taken away from him, and he received unfavorable job evaluations.  *Pl.'s Br.* at 11.  To establish constructive discharge, Orji must demonstrate that the City "knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign."  *Tanganelli v. Talbots, Inc.*, 169 Fed. Appx. 123, 127 (3d Cir. 2006) (quoting *Goss v. Exxon Office Sys. Co.*, 747 F.2d 885, 888 (3d Cir. 1984)).  "Intolerability…is assessed by the objective standard of whether a 'reasonable person' in the employee's position would have felt compelled to resign–that is, whether he would have had no choice but to resign."  *Id.* (quoting *Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 976 (3d Cir. 1998)).

The City argues that Orji's constructive discharge claim cannot survive because Orji has not pointed to any evidence to support an argument that his resignation was anything but voluntary. I agree.

To begin with, Orji has not alleged that the City permitted any "conditions of discrimination" to support a claim for constructive discharge. *See Sznaider v. Linvengrin Found., Inc.*, 2001 WL 34368919, No. Civ. A 01-850, at *3 (E.D. Pa. Nov. 21, 2001) (Tucker, J.) (noting that "a plaintiff must prove that the intolerable conditions were a result of unlawful discrimination"). I have already noted that Orji has failed to point to any evidence suggesting that the decision to deny him a promotion was based on anything but legitimate, non-discriminatory reasons, and he has not pointed to evidence that the circumstances surrounding the intent to demote give rise to an inference of discrimination. Thus, on this basis alone, he is precluded from establishing a constructive discharge claim.

Moreover, there is "nothing approaching 'intolerability' here." *See Tanganelli*, 169 Fed. Appx. at 127. While Orji does identify the existence of factors often considered by courts in analyzing a constructive discharge claim, he does not point to any evidence that conditions here were "so unpleasant or difficult" that a reasonable person in his shoes would have felt "forced out," or compelled to resign. *See Clowes v. Allegheny Valley Hosp.*, 991 F.2d 1159, 1161 (3d Cir. 1993). The fact that he received a less than satisfactory performance report prior to the City's notice of demotion, which would have resulted in demotion to a position with different job responsibilities and lower pay, does not automatically equate to a claim of constructive discharge. Orji has not pointed to any evidence that the City subtly coerced him to leave, by suggesting he resign or retire, or by threatening him with discharge.[19]

_____

[19] Contrary to plaintiff's assertion that he was threatened with discharge, the record shows that McAnally's written reprimand merely notified plaintiff of the possible consequences of his failure to improve his job

Nor does Orji point to any harassment or other unpleasant behavior that would suggest that the environment was so intolerable that a reasonable person could no longer work there. His belief that taking the demotion would subject him to "embarrassment and hostile work environment," is not sufficient. *See Pl.'s Br.* at 11. The law clearly "does not permit an employee's subjective perceptions to govern a claim of constructive discharge." *See Clowes*, 991 F.2d at 1162 (internal citations and quotations omitted). Finally, Orji does not point to any evidence that he explored alternatives to resignation, such as a transfer to work with a different supervisor, or that he considered other avenues, such as utilizing the appeal process, "thoroughly before coming to the conclusion that resignation is the only option." *See id.* at 1161 (noting that it was "highly significant" whether employee considered alternative avenues prior to leaving). Because Orji has not pointed to evidence creating an issue of fact that his resignation was anything but voluntary, I must grant summary judgment in favor of the City on the constructive discharge claim.

### B. Retaliation under Title VII and ADEA

Title VII prohibits an employer from discriminating against an employee because he has made a charge of or opposed an unlawful employment practice. *See* 42 U.S.C. § 2000e-3(a). The language of the anti-retaliation provision of the ADEA, 29 U.S.C. § 623, mirrors that of Title VII and therefore the same analysis applies: if Orji establishes a *prima facie* case of retaliation, the burden shifts to the City to articulate a legitimate reason for the adverse

---

performance, noting that the ramifications could include "more severe disciplinary action…up to and including dismissal." *See Def.'s Br.*, Exh. 38.

employment action, and then if the City satisfies that burden, Orji must point to evidence demonstrating the proffered reason is pretextual.[20]

To establish a *prima facie* case of retaliation, Orji must show that: (1) he engaged in protected conduct; (2) the City took an adverse employment action against him; and (3) there was a causal connection between his protected activity and the City's adverse employment action. *See Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006).

As a matter of law, I find that Orji engaged in a protected activity on September 3, 2010, when he submitted a memorandum to D'Attilio containing allegations of McAnally's discriminatory actions.[21] Moreover, I find that the City took an adverse action on August 31, 2010 when Orji was given a "Disciplinary Action" notice that the City intended to demote him.[22] Indeed, Orji accepted the August 31 memorandum as an adverse action because he responded three days later directly to the City's notice. In his response, he disputed the City's reasons for *the decision to demote him*, asked for a hearing on *the decision to demote him*, charged that McAnally had "set [him] up for this" (i.e. *the demotion*), and said that "[t]his response serves as a formal submission of letter of resignation of my employment with the City….I would rather

<hr>

[20] While it does not appear that Orji properly raised a retaliation claim under the PHRA, the same analysis would apply to any retaliation claim under Pennsylvania state law as applied to the federal statutes. *See Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567 (3d Cir. 2002) (interpreting PHRA and ADEA retaliation claims under the same standard); *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997) (noting applicability of Title VII standard to PHRA retaliation claim).

[21] The parties agree that Orji engaged in protected activity on this date and not on any prior occasion. That Orji generally complained to D'Attilio in April 2010 about not receiving the HRTS-C promotion is not protected activity. *See Davis v. City of Newark*, 417 Fed. Appx. 201, 202-03 (3d Cir. 2011) (noting that since "only complaints about discrimination prohibited by Title VII…constitute 'protected activity,'" it follows that, "[g]eneral complaints of unfair treatment will not suffice").

[22] The August 31 memorandum cites the Civil Service Regulation governing demotions, which requires "notice of involuntary demotion" be given. *See Def.'s Br.*, Exh. 41. The memorandum then states, "[y]ou are hereby notified of the intent to demote you to the class of Personnel Analyst 2 because you are not performing at the level of a Hiring Services Associate 3. You have the right to a departmental hearing prior to this Notice being issued. Should you want a hearing please send a memo in writing to the Director with a copy to me within 7 days of this memo. A hearing will be schedule[d] following your request. Should you decline a hearing, the Notice of Involuntary Demotion will be issued to you." *Id.*

resign my employment with the City…than be subjected to this agony and humiliation." *See Def.'s Br.*, Exh. 43. Following the hearing, the City fixed the date that Orji's demotion would be effective, but Orji fixed a date for his resignation to be effective that was prior to the demotion's taking effect.

There was no retaliation: on August 31, 2010, the City told Orji it intended to demote him and never deviated from that course. On September 3, 2010, Orji said "I resign" and never deviated from that course. The City set a date for his demotion to be effective and Orji set the day before as the date his resignation would be effective. There was no demotion. Orji resigned.

Because Orji's protected activity, that is his September 3 complaint to D'Attilio regarding McAnally's discriminatory conduct, occurred *after* the adverse action, that is the August 31 notice of intent to demote him, Orji cannot claim that the City's decision to demote him was the *result of* his complaint. The fact that Orji did not receive the City's formal notice of demotion until October, or several weeks after Orji's complaints of discrimination, does not change this result. *See Clark Co. School Dist. v. Breeden*, 532 U.S. 268, 272 (2001) ("Employers need not suspend previously planned [employment actions] upon discovering [protected activity], and their proceeding along lines previously contemplated, though not yet definitively determined, is not evidence whatever of causality."); *see also Warfield*, 460 Fed. Appx. at 132 (finding no causal connection where employer learned of plaintiff's complaint two days after it issued plaintiff a notice of termination even though plaintiff was not officially terminated until several weeks later); *Windfelder v. May Dep't Stores Co.*, 93 Fed. Appx. 351, 355 (3d Cir. 2004) (finding that employer who had already begun termination proceedings against employee was not required to halt those proceedings simply because the plaintiff wrote a

letter alleging retaliation without any other evidence of retaliation).  Nor does the existence of a hearing or a formal process prior to demotion change the analysis.

Orji's protected activity was not the cause of the adverse action.  The adverse action came first.  Thus, Orji has failed to meet the *prima facie* requirements for a retaliation claim and it is unnecessary to evaluate his claim under the remaining steps of the burden-shifting framework.  I must grant the City's motion for summary judgment with respect to Orji's retaliation claim.

## IV.    <u>CONCLUSION</u>

For the aforementioned reasons, I will grant the City's motion for summary judgment.  An appropriate order will follow.